A prompt decision of the present motion is earnestly desired by the interested parties. I shall accommodate them.
The defendants seek an order striking out the original and supplemental bills filed by the complainant in this cause. In substance, the reasons assigned are that the associated bills fail to charge a cause of action within the jurisdictional cognizance of this court. Rule 69. The motion is, of course, the modern equivalent of a demurrer under the former practice and carries with it, for immediate purposes, an acknowledgment of the truth of all the material and adequately pleaded factual charges of the bill as supplemented. The rule is also elementary that except in most unusual circumstances, affidavits are ineffectual to reinforce the bill by the introduction of external facts.
An abridged statement of the facts alleged suffices to display the adaptation of the points debated. The complainant, Goldberg's Corp., known prior to August 18th, 1937, as "Hoxton Mercantile Corporation," conducts a capacious department store on premises owned by the defendants The Goldberg Realty Investment Company and The 108 South Broad Realty Corp., situate at Nos. 102-112 South Broad *Page 417 
Street in the City of Trenton. National Department Stores, a Delaware Corporation, maintaining department stores in many communities throughout the nation, is the owner of all of the issued capital stock of the complainant. Harry H. Schwartz is the president of the parent company and a member of the board of directors of the complainant. Mr. Joseph W. Wolf is president of Goldberg's Corp.
The defendant Milton H. Goldberg is the president of both of the corporate defendants. The remaining defendants, Benjamin L. Goodstein, Samuel Swern, Harry L. Goodstein, Hyman Green, Jennie R. Green, Sadie Swern, Sadie Goodstein and Kathryn Goodstein, are partners trading as Swern Company and engaged in the operation of a department store at No. 123 South Broad Street at Trenton, in the immediate neighborhood of the complainant's store.
On May 31st, 1934, a written lease was executed in the names of "Goldberg Realty Investment Co. and 108 South Broad Street
Realty Corporation" as "Landlords" and in the corporate name of "Hoxton Mercantile Corporation" as "Tenant," whereby the landlords demised to the complainant the premises now occupied by the latter at Nos. 102-112 South Broad Street for a period of ten years and one month, commencing on January 1st, 1934, at noon, and terminating at noon on February 1st, 1944. That instrument conferred upon the complainant an option to renew the lease in concert with the following stipulation:
 "6. THE LESSORS COVENANT AS FOLLOWS:
"(a) That the Lessee shall have and hereby is given the option to renew this lease for a further term of ten years, to commence at Noon on the first day of February, 1944, and to continue until Noon on the first day of February, 1954, upon the same terms and conditions as in this lease contained for the period subsequent to January 31st, 1936, excepting that the minimum annual rental during such renewal period shall be $55,000.00 for each `rent year' and the monthly installments shall be $4,583.33 each and there shall be no limitation on the maximum rental for such renewal period. The aforesaid renewal shall become effective and the term of this lease shall be deemed continued until the first day of February, 1954, only in the event that the Lessee shall exercise the said option by a written notice to that effect given to the Landlords and served by Registered Mail addressed to the Landlords, to the address last known to the Tenant, on or before the first day of August, 1942; except that in the event of a *Page 418 
total destruction of the premises after February 1st, 1939, such renewal privilege may be exercised only by written notice similarly given within thirty days after such destruction."
As early as "a year and a half" prior to August, 1942, the complainant definitely resolved that it would not exercise the option. Inferentially, the initial reason for that decision was that the demised premises were in need of extensive and costly improvements. A significant fact is that the complainant never manifested a desire to renew the lease until the institution of this cause. The complainant, however, complied with the covenants of the lease, and in return it has enjoyed the continuous and unmolested possession of the demised premises during the period specified in the lease.
On or about December 28th, 1943, the landlords notified the complainant that the premises had been let to another tenant and that the complainant would be obliged to surrender possession at noon on February 1st, 1944. The notice interrupted the complacency of the complainant.
It is averred that if evicted from the premises irreparable harm will result to the complainant in that there is no building in Trenton other than the one it now occupies which has the required floor space, nor can any space be found in Trenton which can be rendered suitable for its business by reason of the restrictions of the War Production Board. Reference is made to the gross business conducted by the complainant on the premises during the past ten years, and also to other factors such as the number of charge accounts and the number of persons regularly employed.
So situated, the complainant filed its original bill (January 31st, 1944) praying (a) that the landlords be enjoined from prosecuting any action to dispossess the complainant; (b) from letting the premises to Swern Company or any other party; (c) that the complainant now be afforded a reasonable time within which to exercise the option contained in the lease or (d) that it be decreed that the complainant is a tenant of the premises from year to year with a term expiring February 1st, 1945; (e) that Swern Company be restrained from instituting any action at law or in equity against the complainant concerning the occupancy of the *Page 419 
premises and (f) that Swern Company be adjudged to hold its future tenancy in trust for the complainant.
The additional facts upon which the complainant contrives its alleged right to equitable relief can be concisely stated.
Although the complainant was disinclined to pursue the option, several occasional conferences attended by authorized representatives of the landlords and the complainant were held between 1940 and December, 1943, relative to the organization of a new lease presumably to become effective on February 1st, 1944, with new and dissimilar terms. Means of financing the desired structural improvements, and if such means were unavailable, a reduction in rent, were subjects of discussion. A lease for a term of twenty years was evidently in contemplation. It is charged that the representatives always manifested confidence in their ability to reach an eventual agreement. However, the acknowledged fact is that the parties never united in the adoption of mutually satisfactory terms for the consummation of another lease. Two letters incorporated in the bill by reference are exceedingly expository.
"August 7, 1942.
Mr. Harry Schwartz c/o National Dept. Store New York City
Dear Mr. Schwartz:
Even tho you did not see fit to exercise your option on the Trenton store I feel it is my duty to advise you that I have been approached by a large concern who are most anxious to negotiate with me for a lease on the property.
I have an appointment with them for this coming week, Tuesday, to be exact, but before going to meet them I wanted you to know that I am calling it to your attention and that my `heart' and feelings are leaning toward `GOLDBERGS.' However, in justice to myself, I cannot afford to be `left on a limb.'
So that if you are interested in keeping the store I urge you to make up your mind at once and advise me of your best and final proposition.
I want you to take this letter in the spirit it is written and not to feel that it is in any way a threat nor an inducement to hurry your decision.
With kind personal regards, I am
 Yours very truly, (Signed) MILTON H. GOLDBERG." *Page 420 
"August 22, 1942.
Mr. Milton Goldberg, c/o Stacy-Trent Hotel, Trenton, New Jersey
Dear Mr. Goldberg:
Upon my return after an absence from the city, I found your letter of August 7th.
In our conferences inaugurated a year and a half ago, we advised you informally that we could not exercise the option, and conferences were inaugurated for the purpose of finding a mutually advantageous formula for the continuation of GOLDBERGS in its present location, I recall quite clearly that at the last of these conferences with you which took place on November 13th, 1941, I asked you to work up and submit to us a proposal along the lines then under discussion — which you agreed to do. Although since that date conditions have changed materially, I have heard nothing further from you until your letter of August 7th.
In order that there may be no misunderstanding of the situation, I hereby state unreservedly that GOLDBERGS are willing and desirous of working out some mutually satisfactory arrangement for continuing occupancy after the expiration of their present lease, and that a conference at this office may be had at any mutually convenient time in the immediate future requested by you.
We do hope that the conferences may be conducted in a friendly and cooperative spirit which recognized the mutuality of interest involved in the discussions. The conferences which took place some ten years ago were, of course, characterized by a tension — perhaps excusable — resulting from the injection of such angles as `former agreed rental,' `claims,' etc., none of which angles presently exist.
We therefore await your further advice.
 Sincerely yours, (Signed) HARRY SCHWARTZ."
Another proposal is that in December, 1943, the complainant first learned that the charters of the corporate landlords had been forfeited by proclamation of the Governor previous to the making of the lease on May 31st, 1934, and the exercise of the corporate powers of these companies continued to be suspended and indeed enjoined until restored on December 21st, 1943. I pause here to stress the fact that the forfeiture of the charters of the landlords was unknown to the complainant at the time prescribed for the acceptance of the option and assuredly had no causal relation to the failure of the complainant to renew the lease.
The supplemental bill reveals that on January 31st, 1944, an act of the legislature became effective which reads: *Page 421 
"1. Any written lease heretofore made by or to a corporation, organized under the laws of the State of New Jersey, affecting any lands, tenements or hereditaments situate in this State is hereby validated and confirmed notwithstanding that the charter of such corporation may have been forfeited for the nonpayment of State taxes before or after the time of the making of such written lease, so that any such written lease shall be as valid and effectual both at law and in equity for the entire term set forth in such written lease to the same extent that such written lease would have been valid and effectual if the charter of such corporation had never been forfeited; provided, however, that the charter of such corporation has been reinstated.
"2. This act shall take effect immediately."
Now anent Swern Company. Benjamin L. Goodstein, one of the partners of Swern Company "has been for many years a close friend of" Joseph W. Wolf, president of the complainant. The relationship is thus represented in the bill. It is not alleged that Goodstein was an officer or stockholder of either of the landlords or had any express or implied authority to speak on behalf of either. Nor is it declared that Mr. Goodstein had any such authority to speak for his partners, seven in number. Nevertheless it is declared that between the month of June, 1942, and December 8th, 1943, in the informal conversations between Mr. Wolf and Mr. Goodstein, the subject of the new lease between the complainant and its landlords infiltrated. Mr. Goodstein, it is charged, stated that Swern Company considered it advantageous to its business to have the complainant's business also in the same vicinity, and he urged Mr. Wolf to more diligently pursue the negotiations with the landlords. Apparently an admonition. He asserted that Swern Company was not interested in leasing the premises. On December 7th, 1943, Mr. Wolf and Mr. Goodstein met fortuitously on a journey to New York, and Mr. Goodstein again advised Mr. Wolf to satisfactorily conclude some compact with the landlords. Mr. Wolf promptly thereafter solicited another appointment with the representatives of the landlords and he was then informed "that it was too late." The premises have been leased by Swern Company.
Recognizing the facts so disclosed and comprehending as well the inferences to be reasonably drawn from them, the right of the complainant to equitable relief is obscure. *Page 422 
I recall the words of Mr. Justice Heher: "The field of equity jurisprudence is not like unto an unchartered sea, with no compass to guide save the conscience of the Chancellor, unrestrained by principle, precept or rule. Its jurisdiction rests upon and is limited by well established principles; otherwise, there could be no certainty or fixity of right and remedy — its functioning would be attended with uncertainty and consequent confusion. A court of equity is not vested with arbitrary power; it does not rise above all law; nor can it substitute terms for those made by the parties to a contract."Goerke Kirch Co. v. Goerke Kirch Holding Co., 118 N.J. Eq. 1,6; 176 Atl. Rep. 902.
The events in the present case typify a course of bargaining by the complainant, protracted with hazardous persistence and ultimate futility. As early as August 7th, 1942, the representative of the landlords informed the complainant that he had "been approached by a large concern who are most anxious to negotiate with me for a lease on the property." He at that time forewarned the complainant that the landlords could not afford to be "left on a limb." In reply, the complainant iterated its disinclination to avail itself of the option. Confidence boldly displayed is effectual but less perilous when seasoned with a little caution.
The jurisdiction of a court of equity to relieve against unjust and unconscionable forfeitures must be acknowledged. Penalties, forfeitures, and re-entries for conditions broken are not favored in equity. Waiver, estoppel, accident, fraud or mistake are perhaps the common but not the exclusive grounds of avoidance. The circumstances of each case are usually determinative of the propriety of equitable relief. Equitable rights or equitable defenses must be involved. Here, the complainant covenanted to surrender possession of the premises on February 1st, 1944, unless by the performance of a condition precedent it exercised its right to a renewal term. Assuredly, the agreement for renewal conveyed no interest or estate in the premises to the complainant beyond the term of the lease. The right to a renewal could not vest until and unless the complainant complied with the condition. The complainant deliberately resolved to reject the *Page 423 
option and exhibited that intention during a period of three years. The delay has not been slight and inconsequential. It has been excessive and inexcusable.
I again emphasize the conviction that the fruitless negotiations between the complainant and its landlords related to the production of a new lease and in nowise concerned or affected the discarded option to renew the existing one. Cf. Standard OilCo. v. Newark, 127 N.J. Eq. 106; 11 Atl. Rep. 2d 119, which is patently distinguishable. Hence, there is no causal relationship between those negotiations and the failure of the complainant to employ the option, without which the complainant cannot successfully invoke the principles of waiver or estoppel.
The complainant may have sojourned with the anticipation that a new lease would ultimately be formulated, but it was not unaware of the risk. On August 7th, 1942, the complainant was informed that a "large concern" was "most anxious" to lease the premises, and additionally I discover in paragraph 27 of the bill, the allegation that in the fall of 1943 Mr. Wolf, the president of the complainant, "mentioned" to Mr. Goodstein "that he had heard that Milton H. Goldberg (representing the landlords) was trying to interest others in renting the premises * * *." Nevertheless, the complainant preferred to dicker rather than endeavor to seek the restoration of its option. The infirmity of the bill resides conspicuously in its revelation of the facts. If the omission to adopt the option is to be ascribed to negligence, it was certainly negligence of a willful and gross character, and I am not acquainted with any case in which equitable relief has been afforded in delinquencies of that nature.
Nothing in the bills is indicative of any mutual intention to defer the time specified for the exercise of the option. Nothing is alleged to have been done by the landlords of a malicious, wrongful or deceptive nature to induce the complainant to renounce the option. Some considerations of righteousness, justice or morality must exist to enable a court of equity to rescue parties from the natural and reasonably probable consequences of their own imprudence. A *Page 424 
judicial tribunal cannot make a contract for litigants suijuris or compel them to contract with each other.
The other considerations put forth by the complainant in quest of equitable relief are fallacious. It is asserted that by reason of the corporate impotency of the landlord companies, the lease of 1934 was void. 2 Comp. Stat. p. 1634 § 53; R.S. 14:13-4;N.J.S.A. 14:13-4; 4 Comp. Stat. p. 5293 § 512, as amended; R.S.54:11-1; N.J.S.A. 54:11-1, et seq. The argument is enlarged to encompass the contention that the complainant having entered into possession of the premises under a void lease, it acquired by virtue of the statute of frauds (2 Comp. Stat. p. 2610 § 1;R.S. 25:1-1; N.J.S.A. 25:1-1) an estate at will which in consequence of continued possession and the acceptance of rent by the landlords was generated into a tenancy from year to year, citing Stammelman v. Interstate Co., 112 N.J. Law 342;170 Atl. Rep. 595, and that the complainant is therefore entitled to three months' notice of the termination of its tenancy on a period date, which requisite notice has not been given. It is proposed that the statute purporting to empower the Governor to restore to the companies their corporate privileges is unconstitutional and that the validating act of 1944 is ineffectual to divest the complainant of its pre-existing estate at will or tenancy from year to year.
Conceding but not confirming the orthodoxy of the reasoning, it is at once evident that the validity of the statutes in the respects mentioned is essentially a question debatable in a court of law, and one cannot imagine a defense more appropriately available at law than that the tenancy of the defendant has not terminated. I perceive nothing to prevent the introduction of that defense even in a statutory proceeding to dispossess the complainant. I do observe that there inheres in such a contention the acknowledgment that the complainant never had a valid option.
The alternative project would recommend that the option retained its validity notwithstanding the revocation of the charters, and that the title to the demised premises remained in the corporations and their directors became trustees in dissolution. It may be that the corporations would not be *Page 425 
permitted to obtain an unjust advantage by means of their own dereliction in the payment of taxes, but the fact emerging to deadlock the complainant is the confession of the complainant that it had no knowledge of the forfeiture of the charters of the landlords until December, 1943, and it is not intimated in the bills that the complainant refrained from utilizing the right to a renewal of its lease for any such cause or that the complainant otherwise would have demanded a renewal of its tenancy. If the landlords were guilty of deception in pretending to possess corporate powers, the complainant was not thereby ensnared.
It is asserted that a vast and prodigious calamity will be visited upon the complainant, its employees and customers if the complainant is obliged to surrender possession of the premises in which it has aggrandized its business and promoted its good will. The fault itself may be condemned, but the party responsible must atone for it. A court of equity cannot iron out such adversities in the absence of some implicated equitable right or defense.
Then, moreover, the complainant implores the court to decree that Swern Company acquired its leasehold estate in the premises as a constructive trustee of the complainant. This contention reposes upon the supposition that the partnership known as Swern Company indulged in a confidential and fiduciary relationship toward the complainant in the negotiations concerning the future and continued occupancy of the premises by the complainant. That hypothesis has no support among the allegations of the bills. True, the bill charges that Mr. Goodstein, one of the eight partners of Swern Company, was "a close friend" of the president of the complainant, but it is not declared (a) that he had express or implied authority to represent the firm, or (b) that Mr. Goodstein was under any affirmative duty to negotiate a lease for the complainant, or (c) that he undertook to do so, and (d) that he violated the obligations within the scope of his confidential and fiduciary relationship. In order to successfully charge an agent as a constructive trustee, there must exist a connection between the scope of his duties and the transaction in which the agent has sought to profit. It *Page 426 
is not revealed that Mr. Goodstein or Swern Company owed any duty to the complainant, or, if so, that the landlords were aware of its existence. To the contrary, it is disclosed that Swern 
Company was a business competitor of the complainant. Mr. Goodstein repeatedly advised Mr. Wolf to complete an agreement with the landlords. I would hesitate to hold even an agent to be a constructive trustee where, before acting for himself, he expressly afforded his principal an adequate opportunity to act, with full knowledge of the circumstances, and the principal declined to do so. It is not averred that Mr. Goodstein confidentially elicited any secret information from Mr. Wolf and employed it to the advantage of his firm. He is accused of maliciously interfering with an agreement between the complainant and its landlords. The bill divulges that there was no agreement.
The rights of the landlords cannot be capriciously ignored. Where, as here, premises are leased not for a definite sum but at a rental based upon sales by the tenant, the characteristics and capabilities of the tenant are considerations of sharply defined importance. Only most cogent and impelling reasons should induce this court to substitute on the same basis another tenant, perhaps undesirable to the landlords.
At the conclusion of the argument of this motion, I modified the preliminary restraint to enable the landlords to institute an action to obtain possession of the premises and proceed up to the point of trial. I am informed that a dispossess proceeding was commenced in the District Court which pursuant to statutory authority has been transferred to the Mercer County Circuit Court. I am confident that the complainant can obtain any relief to which it is justly entitled in that court.
An order will be advised striking out the original and the supplemental bills in this cause. *Page 427